ON RULE TO SHOW CAUSE WHY JOHN H. SCOTT, COUNTY CLERK OF ESSEX COUNTY, SHALL NOT BE RE-QUIRED TO CORRECT THE OMISSION OF THE NAME OF JAMES K. SHIELDS, AS A CANDIDATE FOR UNITED STATES SENATOR, FROM THE SAMPLE AND OFFICIAL BALLOTS TO BE USED AT THE COMING GENERL ELECTION, TO BE HELD IN ESSEX COUNTY ON NOVEMBER 4TH, 1924.

Decided October 25. 1924.

Elections—Printing Ballots—Withdrawal of Candidates—Provision for Withdrawal Thirty Days Before Election Must Be Read in Connection With Provisions for Filing Papers or Performing Duties on Monday When the Day Fixed Falls on Sunday—Even if Not So, to Make an Order that Manifestly Would Disfranchise Many Voters Because of the Physical Impossibility of Carrying it Out Would Not Be in Accordance With the Spirit of the Statute.

On return of rule to show cause.

Before GUMMERE, CHIEF JUSTICE.

For the rule, William V. Rafferty.

Contra, J. Henry Harrison, Wilbur A. Mott and Joseph G. Wolber.

The opinion of the court was delivered by

GUMMERE, CHIEF JUSTICE (after argument). I said a little while ago that it seems to me that the question whether the name of Mr. Shields should or should not appear on the ballot depended on the construction and effect of this four hundred and forty-sixth section, providing that the filing of a document or performance of a duty on or before a certain fixed date could be done or performed on Monday, rather than on the last day named in the statute, if that day happened to fall on Sunday. This declination, if it had been

filed not less than thirty days before election, could have been filed on the 5th, if that had not happened to be Sunday. That is settled under our decisions. So, I have no doubt that, if the 5th had not fallen on Sunday, and this declination had been delivered to the secretary of state on the 5th, it would have been delivered within the time fixed by the statute. I agree with Mr. Justice Minturn that, except for this four hundred and forty-sixth section, the delivery of the declination to the secretary of state on Monday would have been too late, and it would have been properly disregarded by the officers interested in the carrying out of the provisions of the Election law. The question, therefore, is whether delivery of this certificate of declination to the secretary of state on Monday, the 6th, was permitted by the legislature by the true construction of section 446. The language of that section is that whenever the day of the filing of any petition or other document, or the performance of any duty required by this act—that is, required by any of the provisions of the Election law—shall fall on the Sabbath day, then said filing or said performance shall be performed on the following Monday.

So, the first question is whether the delivery of the paper, this declination, although it is not so declared in the two hundredth section, is a filing in the secretary of state's office, and I think it is. It was not the intent of the legislature that a candidate for election should go to the secretary of state and hand him a paper containing his declination, duly acknowledged, so as to show beyond question that it is his act, and that the secretary of state should then take it home and put it among his own personal papers or throw it in a waste-basket. The candidate is to deliver it to the secretary of state, as the representative of the public, so that the people of the state, the electorate, may know, from Sussex to Cape May, that this candidate has retired from the contest, by going to the secretary of state's office and examining the documents on file in his office. It is to remain there, in my humble opinion, just as any other paper filed there would, so that next year, or ten years from now, if anybody

wanted to know what had happened in the Shields case, they can go to the secretary of state's office and say, "Let me see the declination of Mr. Shields filed in your office on the 6th day of October, 1924." That is the filing of a public document, in my opinion. But, if it was not, still I think the declination comes within the description of the four hundred and forty-sixth section, for this reason: The section says, "where a paper is to be filed or where a duty is to be performed by any person." Can there be any doubt, where a candidate for an office desires to retire from the contest, that a public duty rests upon him to see that the people of his state, or of his county, or of the district in which he is running, shall know that he is no longer a candidate, so that the votes of those who would otherwise have cast a vote for him should not be wasted. That is a public duty which he owes to the people whose votes he is seeking, and so, as the statute says, that duty may be lawfully performed on Monday.

For the reasons indicated, I think the four hundred and forty-sixth section applies to the situation which we have been discussing this morning, and that, where the thirtieth day before election falls on a Sunday, a candidate who desires to withdraw from a contest may do it by presenting his certificate of declination to the secretary of state on the following Monday. That is what was done in this case, and, as a result of this reasoning, which seems to me to be sound, I think that the name of Dr. Shields has no place on any ballot in the State of New Jersey.

Now, I may go a little further, and say as to this reasoning, which seems to me to be sound, I am not depending entirely upon my own view. On Thursday of this week the members of the Supreme Court happened to be in Trenton in the performance of their official duties, and we all considered this question of such great importance to the whole people of the state that we devoted two hours to a discussion of these very questions which I have elaborated this morning, and by a very large majority of all of the justices we reached the conclusions that I have attempted to express

this morning. So, that, even if I personally had any doubt on the question (and I have not), I would feel very much shaken as to the soundness of that doubt, and would be inclined to feel that I should not set up my opinion against that of the great majority of my brethren. For the reasons I have stated, I decline to make an order on the clerk to destroy the seventy-five thousand ballots that have already been printed, and to print by next Saturday the two hundred and thirty thousand necessary for use at the coming election.

And I will say one word more. Even if I had reached the opposite conclusion as to the construction of the statute, I would refuse to make this order. This declination was filed in the secretary of state's office on the 6th of October, and it was notice to the world of the action of this candidate; and this present application was made to me on the 23d, between two and three weeks afterward, during all of which time the county clerk of this county, in the faithful performance of his duty, has been engaged in making preparations for the coming election, for the benefit of the people of the county whom he is serving, and he has largely performed that duty; and it is my humble opinion that, if anybody wanted to challenge the propriety of omitting the name of this candidate on the ballot, he should have acted promptly.

It seems impossible to escape the conclusion that, even if the name of Shields was improperly left off, a direction to the county clerk to destroy all ballots already printed and reprint them would necessarily disenfranchise a large number of the voters of this county, and I think that it was for the very purpose of preventing such a result that the legislature said in the two hundredth section, under which this proceeding has been inaugurated, that the application may be made to the Supreme Court justice to compel the county clerk to correct the ballots, and it says that the said justice, upon being satisfied of the existence of error in the ballot as printed, may thereupon summarily require the county clerk to correct such error, or he may, although satisfied of

the existence of the error, require the county clerk to show cause why said error should not be corrected; and it is impossible for me to conceive a stronger reason that could be suggested by the county clerk for refusing to order a reprint than the fact that it would be a physical impossibility to reprint in time, and the result of such order would be to disenfranchise a large number of the voters of his county. Would any justice of the Supreme Court, when that situation was presented to him, say "it does not make any difference; I don't care whether my order will disenfranchise ten or twenty per cent. of the voters of the county; you go ahead and do as I say?" That it was the purpose of the legislature to guard against such a result is, I think, made clear by the language I have called attention to.

Mr. Clerk, you may go on and print the ballots as you have started to do.